

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

<hr>

### NO. AP-76,819

<hr>

**KIMBERLY CARGILL, Appellant**

**v.**

**THE STATE OF TEXAS**

<hr>

**ON DIRECT APPEAL FROM CAUSE NO. 241-1510-10
IN THE 241ST DISTRICT COURT
SMITH COUNTY**

<hr>

**ALCALA, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined. PRICE, J., concurred.**

## O P I N I O N

In May 2012, a jury convicted appellant of capital murder. TEX. PENAL CODE § 19.03(a)(9).

Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure

Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX. CODE CRIM.

PROC. art. 37.071, § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).  After

reviewing appellant's eighteen points of error, we find them to be without merit.  Consequently, we

affirm the trial court's judgment and sentence of death.

## I. Background

Appellant was charged with intentionally causing the death of her son's babysitter, Cherry

Walker,

> by causing the asphyxiation of Cherry Walker by impeding her air flow and by
> impeding her blood flow and by a means unknown to the grand jury; and by
> homicidal violence through a specific means unknown to the grand jury, and
> [appellant] was in the course of committing and attempting to commit the offense of
> retaliation.

The jury convicted appellant of capital murder after hearing the facts of the offense, implicitly

rejecting appellant's trial testimony and deciding that the medical evidence established that Walker's

death was caused by homicidal violence.

### A.  Facts of Offense

In 2010, appellant was under investigation by Child Protective Services (CPS) for allegedly

having abused her son Zach.  In March of that year, CPS responded to the allegations by removing

Zach and his younger brother Luke from appellant's custody.  On May 18, appellant violated a

voluntary agreement giving temporary custody of Luke to her mother, Rachel Wilson, by taking

Luke from his day care and refusing to return him to Wilson or CPS.  About two weeks later,  on

June 3, CPS obtained an emergency order of protection and returned Luke to Wilson.  A custody

hearing was scheduled for June 23.

Five days before the custody hearing, on Friday, June 18, at around 10:00 a.m., Walker was

---

[1]     Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

served with a subpoena to testify at the custody hearing. Walker was a thirty-nine-year-old mentally challenged woman who lived alone but received daily assistance from a caretaker, Paula Wheeler.

Wheeler was present when the subpoena was served, and she read it to Walker. Upset by the prospect of having to testify, Walker telephoned appellant, who told Walker not to tell anyone about the subpoena. She also told Walker that Walker did not have to testify and offered to hide Walker at her house on the day of the hearing. Appellant then realized that Wheeler was in the room with Walker, and she asked to speak to Wheeler. Appellant asked Wheeler if she had told anyone about the subpoena. Wheeler stated that she had told her supervisor. Appellant told Wheeler that she was not much of a friend to Walker if she let Walker go to the hearing, and that "they" would confuse and upset Walker if Walker testified. Appellant told Wheeler that appellant would lose her child if "they" found out that Walker was mentally challenged.

Appellant's cellular phone records reflected that she initiated over 70 text messages, e-mails, and voice calls that day. After speaking with Walker and Wheeler, appellant telephoned Marcie Fulton, Walker's neighbor who also sometimes babysat Luke. When appellant learned that Fulton had also been subpoenaed to testify at the custody hearing, she told Fulton to leave town or else hide at appellant's house to avoid going to court. Appellant told Fulton that if she did testify, Fulton should say good things about appellant. Fulton noted that appellant sounded "frantic." In addition, appellant telephoned her friend, Angela Hardin. Appellant told Hardin that her mentally challenged babysitter had been subpoenaed for the custody hearing and that, if the babysitter testified, it would ruin "everything." Appellant told another friend, Bill Selmon, that Walker had been subpoenaed and that she was afraid she would lose custody of Luke because of Walker. Both Hardin and Selmon noted that appellant sounded upset.

Wheeler observed that Walker was shaking after her conversation with appellant. Walker stated that she was nervous and did not want to go to court. Wheeler took Walker to meet with Wheeler's supervisor, Pertena Young. Young copied the subpoena for Walker's file and telephoned the assistant district attorney to explain that Walker was mentally challenged. Later, when Walker was alone in her apartment, she continued to worry about the subpoena and telephoned several people to talk about it. She called Young, who again contacted the assistant district attorney. Walker also contacted Fulton, and they agreed that they would not lie for appellant at the custody hearing. Walker told Fulton that appellant wanted to take Walker out to dinner.

Around 7:55 p.m., Walker called Wheeler and told her that appellant was going to take her out to dinner and pay her a large amount of money to clean appellant's house. Walker stated that she was nervous, she did not want to go, and she was full because she had already eaten. Wheeler advised Walker not to go. She told Walker to take her medicine, go to bed, and not answer the door. Some time after that conversation, however, appellant picked up Walker. At 3:18 p.m. the following day, Walker's burned body was found face-down on the side of a rural road, eight to ten miles from her apartment.

## B. Appellant's Testimony at Trial

Appellant testified at trial that she arrived at Walker's house around 8:30 p.m. to take her to dinner. Appellant stated that she wanted to meet with Walker because she wanted to discuss Walker's testimony before the custody hearing and also because she was concerned for Walker's well-being. Appellant stated that, after picking up Walker, they stopped by appellant's house because appellant was supposed to meet Selmon there to talk to him about testifying at the custody hearing, but he was not there. Appellant left Walker in the car while she went inside and put her

cellular phone on the charger, and then they went to dinner at a restaurant. Appellant testified that they had a pleasant conversation during dinner.

After dinner, however, Walker wanted appellant to take her to a particular bar where Walker hoped to find her boyfriend. Appellant testified that she did not want to do that, and she started to drive Walker home. When Walker realized that appellant was not taking her to the bar but instead was taking her back to her apartment, she became upset and started having a seizure.

Appellant testified that when Walker's seizure started, she panicked and did not act rationally. She explained that she did not call 9-1-1 because she did not have her cellular phone. Appellant acknowledged that she was driving past a hospital when Walker's seizure began, but stated that she did not turn toward the hospital because she was in the wrong lane and did not want to hold up traffic.

Instead, appellant drove to the parking lot of Walker's apartment complex. Appellant parked her car and went around to the passenger side. When she opened the passenger-side door, Walker, who was still having a seizure, fell to the pavement. Walker stopped moving a few seconds after she hit the ground.

Appellant testified that she knocked on the doors of several apartments looking for help, but there was no one around. Appellant returned to her car and discovered that Walker had no pulse and was not breathing. Appellant, who was a licensed vocational nurse (LVN), performed cardiopulmonary resuscitation (CPR), but it did not work. She then lifted Walker back into the car and drove back toward the hospital, which was only a couple of blocks away.

Before arriving at the hospital, however, when appellant realized that Walker had been unresponsive for about ten minutes, she decided not to take Walker to the hospital because Walker

was already dead and appellant "knew how it would look." She drove around for thirty to forty-five minutes and ended up on a country road. She stopped the car and pulled Walker onto the ground. Appellant poured lighter fluid onto Walker and ignited it to cover up appellant's deoxyribonucleic acid (DNA), which would be on Walker's clothing because appellant had performed CPR.

Appellant testified that the next day she washed her car to get rid of evidence, went to the police station under the pretense of reporting a lost dog in order to find out if they knew anything about Walker, and called a friend to tell her a falsehood that she had not seen Walker the previous night. Appellant later told another friend, Hardin, that she had not taken Walker to dinner because Walker had gone out to eat with a white man. Appellant acknowledged that this false story was the one she initially told police.

## C. The Medical Evidence

Dr. Meredith Lann, the medical examiner who conducted the autopsy on Walker on June 20, concluded that the cause of death was homicidal violence through means unknown. She noted a few non-specific findings, such as petechia in the eyes, that were consistent with asphyxiation. The tops of Walker's white tennis shoes had a unique pattern of scuffing consistent with being dragged, and the soles of her shoes were clean. Abrasions on Walker's forehead and on the prominence of her nose and cheeks were consistent with being placed on a gravel surface. The limited extent of the abrasions suggested that something like a sheet was underneath Walker's body and protected it as it was being dragged. The absence of soot in Walker's airways indicated that she was not breathing when her body was burned.

Lann testified that Walker's hands and arms showed no signs of a struggle and that her bruises were not consistent with defensive wounds. Lann observed some bruising on Walker's right

upper forehead, which she believed resulted from a pre-mortem blunt force injury. Walker also sustained bruising to the left side of her forehead. Lann was not sure if Walker was alive or dead when that injury was inflicted, but opined that it was inflicted very close to the time of death. Lann further noted bumps and bruises on Walker's forehead, the back of her right arm and shoulder, left elbow, and the back of her right thigh. The distribution of these injuries, together with the situation in which Walker's body was found, indicated that someone purposefully caused Walker's injuries.

Lann also noted bleeding within the soft tissues over Walker's chest near the sternum. Any pressure or injury to the chest area, including performing CPR or holding someone down, would result in such bruising. The tip of Walker's tongue was focally seared and hemorrhagic.

Acknowledging the absence of ligature marks and bruises around Walker's neck, Lann stated that she could not be sure that Walker died by asphyxia. Lann also acknowledged that the blunt force injuries would not be sufficient to cause death, and that the petechia she observed in Walker's eyes could be consistent either with asphyxiation or with Walker's body lying face down in the early stages of decomposition. But the blunt force injuries and the presence of petechia, when combined with the thermal injuries, led Lann to conclude that Walker died by homicidal violence through a specific means or mechanism that was unknown.

Lann also reviewed Walker's medical records, which indicated a prior diagnosis of "epilepsy, unspecified." On April 5, 2010, Walker reported having seizures, but when her doctor questioned her about them, she stated that she had tremors rather than seizures. Walker did not endorse any symptoms consistent with seizures. Similarly, on February 10, 2010, Walker self-reported having "severe seizures" that she described as "sudden blackouts." However, when her treating doctor named symptoms typically associated with seizures, Walker denied having any of them. A medical

record from November 20, 2007, indicated that if Walker did not take her anti-seizure medicine, Tegretol, for longer than a month, she could have a seizure. Walker did not report any seizures during a doctor's visit in June 2006. During a doctor's visit on September 1, 2004, she reported one seizure, which corresponded to a time that she was prescribed Wellbutrin, a medication that can have a side effect of seizures in people prone to them. She also self-reported a seizure on January 22, 2003.

Lann acknowledged that it is possible for a person to die of a seizure, and in such a case an autopsy might not show changes in the brain indicative of a seizure. Lann, however, did not believe that Walker died of a seizure. At the time of the autopsy, which was more than twenty-four hours after Walker's death, the level of Tegretol in her system was still in the low-to-therapeutic range. Also, the injury to Walker's tongue was not caused by biting associated with a seizure. Lann opined that it was not reasonable that a LVN such as appellant would be driving with Walker as a passenger in her car, watch Walker have a seizure but not get help, and then decide to dump and burn the body.

Dr. Richard Ulrich, a neurologist, testified that he treated Walker for her seizure disorder on one occasion a long time ago and then on a regular basis starting in 2003. He last examined Walker on April 24, 2009. Ulrich noted that Walker had "generalized tonic-clonic seizures" in which she would stiffen up and jerk with her head back and eyes rolled up, go unconscious briefly, and wake up confused, but then "come back to herself" after an hour or so. Such seizures are fairly normal for a person with epilepsy. Ulrich's records indicated that Walker's seizures began when she was sixteen. In 2003, Ulrich prescribed Tegretol. Walker had no seizures as long as she was taking Tegretol, but she would sometimes have a seizure if she ran out of her medicine. Ulrich tested Walker and noted that her brainwave was consistent with a seizure disorder. The results of blood

work and a computerized axial tomography (CAT) scan of Walker's brain showed no additional abnormality. Ulrich had a note in his records from June 22, 2006, indicating that Walker had been out of Tegretol for over a month but had not had a seizure.

Ulrich testified that at the time of the autopsy, Walker's brain appeared normal and uninjured. The toxicology report reflected a below-therapeutic level of Tegretol, but the level of Tegretol would have been higher when Walker died than it was two days later when the toxicology work-up was completed. A record of a doctor's visit from 2004 showed that the Tegretol level in Walker's blood was even lower than the level noted in the toxicology report, but Walker did not report any seizures. Ulrich testified that it is possible for a person to die of a seizure, but in his forty years of practicing medicine, he had never seen it happen. Ulrich also acknowledged that he was familiar with "sudden unexpected death in epilepsy syndrome." However, he had never personally encountered it. Ulrich opined that it was not likely that Walker had a seizure and died from it on June 18, 2010, even if she was under stress.

When asked to clarify what he meant by "not likely," Ulrich testified that there was a less-than-ten-percent chance that Walker died of a seizure. Only two or three percent of epilepsy patients die from sudden unexpected death in epilepsy. Ulrich had not heard of anyone with epilepsy dying from a seizure or sudden unexpected death in epilepsy in the absence of other underlying problems. Ulrich reiterated that he did not believe that Walker died of a seizure or sudden unexpected death in epilepsy.

## II. Sufficiency of the Evidence

In point of error one, appellant asserts that the evidence was legally insufficient to establish that she was guilty of capital murder as alleged in the indictment. Specifically, she complains that

there was no direct evidence that the victim died as the result of appellant's intentional act. She relies on Dr. Lann's acknowledgment that an autopsy might not reveal the fact that a person died from a seizure, evidence that Walker had a history of seizures, and appellant's trial testimony that Walker suffered a seizure on June 18. Appellant contends that, without direct evidence that the victim died by violent means, no rational jury could convict her of capital murder.

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on the evidence and reasonable inferences therefrom, a jury was rationally justified in finding the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979); *Dobbs v. State,* 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. Each fact need not point directly and independently to the defendant's guilt, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Guevara v. State,* 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

A lack of direct evidence is not dispositive of the issue of a defendant's guilt; circumstantial evidence alone is sufficient. *Dobbs,* 434 S.W.3d at 170; *Guevara,* 152 S.W.3d at 49. Motive is a significant circumstance indicating guilt, and intent may also be inferred from a defendant's acts, words, and conduct. *Guevara,* 152 S.W.3d at 50. In addition, attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are circumstances indicative of guilt. *Id.*; *see also Ex parte Reed,* 271 S.W.3d 698, 749 (Tex. Crim. App. 2008) (stating that defendant's alternate explanation, offered for the first time at trial and inconsistent with his previous statement to police, looked manufactured and implausible).

In this case, the cumulative effect of all the incriminating facts is sufficient to support the conviction. Appellant's testimony provided direct evidence that she was alone with Walker when Walker died. Based on the non-lethal but purposeful injuries to Walker's body, as well as the fact that her body had been burned, Dr. Lann concluded that Walker died by homicidal violence. Additionally, the circumstantial evidence shows appellant's desire to keep Walker from testifying, her inconsistent reports of her activities on the evening of Walker's death, and her calls to her friends in which she lied about not having seen Walker that night. The circumstantial evidence further shows that appellant told an implausible story that Walker had a seizure and died, gave an incredible explanation for why she never obtained help for Walker, and burned Walker's body on the side of a rural road. This evidence, when viewed in conjunction with appellant's own testimony and Dr. Lann's opinion about Walker's cause of death, constitutes sufficient evidence of appellant's guilt. We conclude that, based on the evidence and reasonable inferences therefrom, the jury was rationally justified in finding appellant guilty beyond a reasonable doubt. Point of error one is overruled.

## III. Evidence of Prior Bad Acts

In points of error two through five, appellant challenges the trial court's admission of evidence of prior bad acts.

### A. Testimony from Gillispie

In point of error two, appellant asserts that the trial court erred in admitting evidence of prior bad acts over defense counsel's objections under Texas Rules of Evidence 401, 403, and 404(b).[2] Specifically, the State elicited testimony from Laura Gillispie, an East Texas Medical Center ("ETMC") employee, describing her conversations with appellant in the days leading up to Walker's

---

[2] Unless otherwise indicated, all references to "Rules" refer to the Texas Rules of Evidence.

murder.[3] Appellant complains that this evidence was not relevant and that any probative value was outweighed by the danger of unfair prejudice. She also complains that it was offered to prove appellant's character as a person with an uncontrollable temper who was capable of committing violence to show that she acted in conformity therewith by becoming violent with Walker.

Under Rule 401, relevant evidence is evidence which has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Bekendam v. State,* 441 S.W.3d 295, 303 n.4 (Tex. Crim. App. 2014). Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove a person's character or that a person acted in conformity with that character. TEX. R. EVID. 404(b). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* The list of exceptions set forth in Rule 404(b) is illustrative, not exhaustive. *See Daggett v. State,* 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005).

Faced with an objection, the proponent of the evidence must satisfy the trial court that the extraneous act has relevance apart from its tendency to prove character conformity. *Feldman v. State,* 71 S.W.3d 738, 754 (Tex. Crim. App. 2002). If the proponent succeeds, then the trial court has discretion to admit the evidence. *Id.* Even if the trial court determines that the evidence is admissible under Rule 404(b), it may nevertheless exclude the evidence if it determines that the probative value of the extraneous-act evidence is substantially outweighed by unfair prejudice under Rule 403. *Id.* "Probative value" refers to how strongly an item of evidence serves to make more or

---

[3]     Appellant characterizes evidence of these conversations as evidence of bad acts or wrongs, and the State does not dispute this characterization. Assuming without deciding that this characterization is accurate, we will consider Gillispie's testimony under Rule 404(b).

less probable the existence of a fact of consequence to the litigation, coupled with the proponent's need for that item of evidence. *Gigliobianco v. State,* 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). When the trial court balances probative value and prejudice, a presumption exists favoring probative value. *Feldman,* 71 S.W.3d at 754-55.

The record shows that the prosecutor proffered Gillispie's testimony outside the jury's presence. Defense counsel objected under Rule 404(b), arguing that the State offered Gillispie's testimony to show that appellant was angry and in a rage and therefore more likely to commit capital murder than someone not in a rage. Counsel asserted that the State offered the testimony to show that appellant was a dangerous and violent person generally who was likely to commit capital murder. Counsel contended that this testimony was character-conformity evidence and irrelevant. Counsel further argued that any relevance of evidence of appellant's conduct toward an unrelated person during an unrelated incident was outweighed by its prejudicial effect.

The prosecutor responded that this evidence was intertwined with the offense because it demonstrated that shortly before the offense, appellant was continually upset about losing custody of Luke and felt that she was losing control of the situation. Appellant was becoming frantic as she got closer to losing Luke, the only one of her four children of whom she still had the potential for custody. The calls that appellant placed to ETMC on June 18 were interspersed with the calls that appellant placed to Walker and many others that day. Further, all of those calls involved the custody and control of Luke. This evidence showed appellant's state of mind and conduct around the time of the offense and not that she was a dangerous person generally. The trial court overruled defense counsel's objections. Counsel requested a running objection, which was granted.

Before the jury, Gillispie testified that appellant repeatedly telephoned ETMC and spoke with

Gillispie on June 14, 15, 17, and 18, after appellant learned that Wilson had scheduled a doctor's appointment for Luke. During the custody proceedings, clinic staff had been instructed to give information about Luke only to Wilson. When Gillispie informed appellant that she could not disclose the information that appellant wanted, appellant became extremely upset and screamed at her. Appellant called the clinic three or four times on June 14. She called again five or six times on June 15, with the longest call lasting for twenty-nine minutes. She called an additional five times on June 17, with the longest call lasting about ten minutes. She called three or four times on June 18, with the longest call lasting twelve minutes while Gillispie let appellant "vent." The record shows that this call was placed at 11:07 a.m., which was shortly after appellant spoke with Walker and Wheeler.

The prosecutor asked Gillispie how she would characterize appellant's state of mind during those calls. Defense counsel renewed the previous objections, which the trial court again overruled. Gillispie testified that appellant was in a rage and screaming. Appellant asked Gillispie how she would feel if she did not know what was going on with her own child. She told Gillispie that the clinic had no right to keep an appointment for Luke without her knowledge. Gillispie could not respond to appellant because appellant kept interrupting her and screaming loudly, so Gillispie just listened. On occasion, Gillispie would tell appellant that she had to end the phone call and hang up, but appellant would call back.

Gillispie testified that she had talked to other upset patients and parents, but she previously had never received calls like those she received from appellant. Appellant was more than upset. She was raging with anger. During the call on June 18 at 11:07 a.m., appellant tried to remain calm at first, but ended up yelling again. Appellant's calls and level of rage caused Gillispie to be concerned

for her safety and the safety of others at the clinic. Gillispie warned staff members to keep the clinic's back door locked at all times.

Gillispie's testimony was relevant because it tended to show appellant's state of mind in the days leading up to the evening when she picked up Walker, particularly her preoccupation with custody and control of Luke and her explosive response to any perceived interference. This testimony helped the jury to understand the offense in context. *See Prible v. State,* 175 S.W.3d 724, 732 (Tex. Crim. App. 2005). Under Rule 404(b), Gillispie's testimony was admissible to show appellant's motive for getting Walker alone, appellant's identity as Walker's killer, and the absence of mistake or accident with respect to Walker's death. Under Rule 403, the probative value of Gillispie's testimony was not substantially outweighed by unfair prejudice. This testimony was probative in assessing appellant's truthfulness about her state of mind and her reasons for her interactions with Walker on June 18. The State needed this evidence because it did not have direct evidence of appellant's state of mind or intent, and its circumstantial evidence was contradicted by appellant's testimony that Walker died of a seizure despite appellant's panicked efforts to help her. *See Gigliobianco,* 210 S.W.3d at 641.

The trial court did not abuse its discretion by admitting Gillispie's testimony over appellant's objections. Point of error two is overruled.

**B. Testimony that Appellant Hit Herself**

In point of error three, appellant asserts that the trial court erred in admitting evidence that appellant hit herself with her fists and slapped her own face when frustrated. She argues that this evidence, which the State elicited during the testimony of appellant's friend, Bill Selmon, was not relevant to any issue to be determined by the jury. Appellant acknowledges that defense counsel did

not make a Rule 404(b) objection to this evidence, but she argues that this evidence is "clear[ly] inadmissible character evidence" that was offered by the State to show that appellant is a person prone to use violence when angry or frustrated and that she acted in conformity with this character by killing Walker.

As an initial matter, appellant did not preserve her complaint under Rule 404(b) because her only objection at trial was based on relevance. *See Chambers v. State,* 903 S.W.2d 21, 32 (Tex. Crim. App. 1995). Even if appellant had preserved this complaint, however, Selmon's testimony was admissible because it helped the jury to understand the offense in context.

After CPS first placed Luke with Wilson on March 22, 2010, appellant had supervised visits with Luke at Wilson's house. To help appellant, Selmon went through a CPS background check so that he could supervise appellant's visits with Luke. On one occasion when appellant was driving them to Wilson's house to visit Luke, appellant was in a good mood until Selmon informed her that he would not be able to spend the whole day supervising the visit. Selmon testified that appellant became very upset and started slapping her own face with both hands and hitting herself hard on the leg. Defense counsel objected on the basis that testimony that appellant hit herself was not relevant. The trial court overruled the objection. Selmon testified that while appellant was hitting herself, she spoke in a very loud voice, saying, "You can't do this to me. . . . Not right now." Her hands were not on the steering wheel for a few seconds while she was hitting herself. Appellant's conduct made Selmon very uncomfortable and he wanted to get away from her. He had never seen her do anything like that before.

Selmon's testimony tended to show appellant's state of mind in the months before the offense —particularly her explosive reaction to any interference with her access to Luke. Like Gillispie's

testimony, Selmon's testimony was probative in assessing appellant's truthfulness about her state of mind and her interactions with Walker on June 18. Point of error three is overruled.

**C. Testimony that Appellant told Walker Not to Open the Door for Police**

In point of error four, appellant asserts that the trial court abused its discretion when it allowed testimony that constituted inadmissible hearsay and violated Rule 404(b).[4] Specifically, Wheeler testified that when she arrived at Walker's apartment on May 20, 2010—a date that appellant had possession of Luke in violation of the CPS agreement—Luke was there. Walker told Wheeler that, when appellant dropped Luke off, she instructed Walker not to open her door for the police.

The State proffered Wheeler's testimony about Walker's statement outside the jury's presence. Defense counsel objected, in relevant part, that the testimony was hearsay and inadmissible extraneous bad act evidence under Rule 404(b):

| | |
|---|---|
| [Defense:] | Judge, who—I mean, I've said my position. We believe it's hearsay that doesn't fall within a hearsay exception. We believe it would violate our confrontation clause rights. |
| | We believe it's an extraneous or bad act under 404 that there's not an exception for. We don't believe it's relevant. And if there was any relevancy, we believe under 403, it is vastly outweighed by the prejudicial effect. |
| The Court: | You're saying you believe it is an extraneous offense, bad act? |
| [Defense:] | Yes. Their position is she's making this statement to violate a court order or to be in violation of a court order. That's going to be either an extraneous offense or a bad act. |
| [State:] | And I think it could be an extraneous bad act. But that's not— |

---

[4]     This point of error is multifarious. TEX. R. APP. P. 38.1; *see Williams v. State,* 301 S.W.3d 675, 685 n.5 (Tex. Crim. App. 2009). However, we will address it in the interest of justice.

The Court:     It would be under your theory.

[State:]        And that's not an exclusionary—that doesn't exclude it from the 803(3) exception.  It might trigger a 404(b), but clearly these statements go under 404(b) to her motive and intent not only to . . . commit the murder, but—

The Court:     Well, I understand it's not an exclusive objection.  Obviously—I just want to be sure.  I need to make a balancing test.

* * *

[Defense:]     And, judge, we don't believe it goes to the relationship between the victim and the deceased (sic).  We believe that would go—that would not go towards the relationship—that statement made by [appellant] to Cherry Walker, then related to Paula Wheeler, would not go to the relationship between the defendant and the victim.

[State:]        It would because it shows the defendant knows she's someone who is mentally ill (sic) and can be manipulated and goes directly—we believe that that's very relevant to show—I mean, if [appellant] took the child to someone else and said "Don't open the door . . ." and they're normal and an adult, 39 years old, or "don't open the door for the police," that's going to raise some flags, because she knew that she could take . . . the child to Cherry Walker and that would work.

The Court:     Anything else, [defense counsel]?

[Defense:]     No.  We object.

The Court:     All right.  The . . . statement that is apparently on the records, . . . made by the witness, Paula Wheeler, noted on May 20th, 2010, . . . that she had noted that Cherry Walker had told her on May 20th, 2010, that [appellant] had told Cherry Walker . . . don't open the door for anyone, even the police, the Court is going to find that that statement . . . is relevant.

                Under 401, the Court is going to find that being relevant, that its probative value is not substantially outweighed by the danger of any unfair prejudice.

                The Court is going to find that under 404(b), that that statement being offered as it relates to the CPS protective orders, being a bad act, the Court does find that it is admissible as proof of motive and intent.

* * *

> Further, the Court does find that it does go to the relationship between the deceased, Cherry Walker, and the defendant, . . . , under [the] statute, to show a relationship between the defendant and the victim in regard to the defendant understanding how easy it is, based on the testimony and the record so far, to manipulate the victim in the case, due to her being mentally challenged.

To preserve error on appeal, a party must obtain a ruling from the trial court or object to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2); *Martinez v. State,* 17 S.W.3d 677, 686 (Tex. Crim. App. 2000). In this case, the trial court did not rule on appellant's hearsay objection, and appellant did not object to the lack of a ruling. Thus, appellant failed to preserve her hearsay point of error.

However, appellant preserved error concerning her Rule 404(b) argument. We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Wall v. State,* 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). We will uphold an evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State,* 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

The trial court did not abuse its discretion by allowing Wheeler to testify that appellant told Walker not to open the door for the police. The trial court did not err in admitting this evidence as proof of appellant's motive and intent. This evidence demonstrated that appellant knew that she could manipulate Walker and was willing to do so. It also made Walker a witness to appellant's knowing violation of the CPS agreement and thereby suggested a motive for killing Walker. Point of error four is overruled.

**D. Testimony About Appellant's Family Violence and CPS Proceedings**

In point of error five, appellant asserts that the trial court abused its discretion by admitting

irrelevant and prejudicial evidence of a series of extraneous violent acts that appellant committed against her mother and children. She also complains about the prosecutor's questions to her about the CPS proceedings. Appellant contends that the trial court admitted this evidence in violation of Rules 401, 403, and 404(b). She complains that the prosecutor's questions essentially presented the jury with testimony showing that appellant possessed a violent character and acted in conformity with that character when she killed the victim. Appellant argues that the trial court's admission of this evidence fell outside the zone of reasonable disagreement and denied her a fair trial.

**1. Evidence that Appellant Choked Members of Her Family in the Past**

In a hearing outside the jury's presence, the prosecutor noted that Dr. Lann could not exclude asphyxiation as the cause of Walker's death. Therefore, the prosecutor asserted, appellant's testimony that Walker's death was an accident opened the door to evidence that appellant had choked her mother and two of her sons in the past. The prosecutor argued that this evidence was admissible under Rule 404(b) to show absence of mistake or accident and to establish that when appellant becomes angry at someone, she goes into a rage and chokes that person. He proposed to ask appellant about those incidents during cross-examination.

Defense counsel objected that the extraneous acts were not admissible under Rule 404(b) because the State had not presented evidence that Walker had been choked or that appellant had ever choked anyone to death. Therefore, counsel argued, the extraneous acts were not similar to the offense for which appellant was being tried but instead just showed that appellant had a violent character in general. Counsel also asserted that the prejudicial effect of such evidence far outweighed any probative value. He further stated that appellant's testimony that Walker died of a seizure was not substantially the same as an allegation that Walker died due to a mistake or accident.

The trial court found that Lann's testimony indicated that choking could have been the cause of Walker's death. The court also stated that appellant's testimony that she did not cause Walker's death put identity and intent into issue. Considering all the testimony before the court, the trial judge found that the evidence that appellant had choked her mother and sons satisfied the requirements of Rules 401, 403, and 404(b).

Before the jury, the prosecutor asked appellant if she had an anger problem. Defense counsel objected that this type of propensity evidence was not admissible. The trial court overruled the objection. The prosecutor continued, "You can get violent, too, can't you?" Instead of answering the question, appellant asked the prosecutor to "define violent." The prosecutor asked appellant what she thought violent meant. She stated, "Intentionally hurting someone else." The prosecutor then asked appellant if she remembered putting her hands around her mother's throat in 1994. Appellant responded that she used one hand to push her mother out of her face while appellant was sitting on the floor and her mother was bending down "fussing" at her.

The prosecutor then asked appellant if she had ever put her hands on her son Jamie's throat. Appellant denied it. He then asked her if she put her hands on Jamie's neck and bit his arm. Appellant acknowledged that she had bitten Jamie's arm as hard as she could, but stated that she did so because Jamie had her in a headlock. The State presented three photographs of Jamie's injuries, which were admitted over defense counsel's objections. Appellant explained that the visible scratches on Jamie's neck also resulted from her efforts to free herself from the headlock.

When the prosecutor asked appellant how many times she put her hands on Zach's neck before CPS took him away from her, she stated that she had done that at least a few times, using one hand on Zach's neck to push him against the wall to make him look at her. She stated that she had

done that to her boys "a few times" as they got older and challenged her physically, and she knew she should not have done it. She denied intentionally circling Zach's neck with her hands.

Generally, evidence of extraneous acts may not be used against the accused in a criminal trial because it forces her to defend herself against uncharged acts as well as the charged offense, and it encourages the jury to convict based upon her bad character, rather than proof of the specific crime charged. *Daggett,* 187 S.W.3d at 450-51. However, this general prohibition carries with it numerous exceptions. *Id.* at 451.

Evidence of a person's bad character may be admissible when it is relevant to a noncharacter conformity fact of consequence in the case, such as rebutting a defensive theory. *Powell v. State,* 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). The proponent of the evidence may persuade the trial court that the other crime, wrong, or act tends to establish some elemental fact, such as identity or intent; tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or rebuts a defensive theory by showing, for example, absence of mistake or accident. *Id.* To prove identity, the extraneous offense must be so similar to the offense charged that the offenses are marked as the defendant's handiwork. *Johnston v. State,* 145 S.W.3d 215, 221 & nn.16, 17 (Tex. Crim. App. 2004).

An accused puts her character for veracity (as opposed to her moral character) in issue by taking the stand, and thus she may be impeached in the same manner as any other witness. *Prescott v. State,* 744 S.W.2d 128, 130 (Tex. Crim. App. 1988); *see also Bowley v. State,* 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). Rule 608(b) expressly prohibits the utilization of specific instances of conduct for impeachment except to expose bias, correct any affirmative misrepresentations made on direct examination, or demonstrate lack of capacity. *Lagrone v. State,* 942 S.W.2d 602, 613 (Tex.

Crim. App. 1997).

In this case, the three incidents in which appellant had allegedly choked her mother, Jamie, and Zach in the past constituted specific instances of conduct that were not available to impeach appellant's credibility as a witness because they did not expose bias or correct affirmative misrepresentations. *See id.* Moreover, there was little similarity between the evidence of appellant's past conduct of choking her mother and sons and the evidence of her conduct toward Walker, and so these instances were not admissible to prove identity. *See Johnston,* 145 S.W.3d at 221. Arguably, however, evidence that appellant had choked others when she became angry rebutted appellant's defensive theory that Walker died from a seizure and not homicidal violence. *Powell,* 63 S.W.3d at 438.

Even if the trial court admitted this evidence in error, any error was not reversible. A violation of the evidentiary rules that results in the erroneous admission of evidence is non-constitutional error. *See, e.g., Coble v. State,* 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). We will disregard non-constitutional error as long as it did not affect an appellant's substantial rights. TEX. R. APP. P. 44.2(b); *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have a fair assurance that the error did not influence the jury, or had but a slight effect. *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the

character of the alleged error, and how the error might be considered in connection with other evidence in the case. *See Motilla v. State,* 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Schutz v. State,* 63 S.W.3d 442, 444-45 (Tex. Crim. App. 2001). We examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *Coble,* 330 S.W.3d at 280.

In this case, the jury considered evidence that on the day of the offense, appellant was frantic over the pending CPS proceedings and the prospect of Walker testifying at the custody hearing. Appellant's testimony affirmed the State's evidence that she was alone with Walker when Walker died. Appellant's implausible story that Walker had a seizure and died, her incredible explanation for why she never obtained help for Walker, and her act of burning Walker's body on the side of a rural road provided additional inculpating evidence. Appellant acknowledged that, after the offense, she called her friends to tell them that she had not seen Walker on the day of the offense and that Walker had gone to dinner with a white man. She visited the police station to find out if anyone had discovered Walker's body. Given the strength of the State's case, we can conclude that the admission of evidence that appellant had choked her mother and two of her sons, even if erroneous, did not influence the jury or had but a slight effect.

### 2. Evidence of the CPS Proceedings

Appellant complains about the admission of evidence of the CPS proceedings that were pending at the time of the offense. The prosecutor proffered this evidence as contextual evidence. He asserted that the CPS evidence showed how and why appellant was involved in custody proceedings concerning Luke and rebutted her testimony that, when she took Luke from his day care on May 18, she was only breaking a voluntary agreement.

Defense counsel objected that the CPS evidence was designed to inflame the jury against appellant by including "four months' worth of bad acts and criminal offenses." Counsel asserted that this evidence would be prejudicial and would confuse the issues. The State responded that the evidence would explain to the jury how the CPS proceedings began, why appellant did not want Walker to testify at the custody hearing, and why appellant was so upset in the days preceding the offense. The trial court overruled appellant's objections, finding that the evidence of recent CPS proceedings satisfied the requirements of Rules 401, 403, and 404(b).

When questioned before the jury, appellant acknowledged that on March 22, 2010, CPS removed Zach from her care. On the same date, appellant signed a voluntary agreement placing Luke with Wilson. After she violated that agreement by picking Luke up from day care on May 18, she kept him until June 3, when CPS again took him from her. After Walker babysat Luke on June 3, appellant did not talk to Walker again until June 18, when Walker contacted her about the subpoena.

The prosecutor asked appellant why CPS took Zach and Luke from her. Appellant stated that Zach had accused her of hitting him in the head with an aerosol can. She asserted that CPS took Luke based on the same accusation and not because of any accusations involving her conduct toward Luke.

The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Devoe v. State,* 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Therefore, contextual extraneous-offense evidence may be admissible to the extent that it is necessary to the jury's understanding of the offense, when the offense would make little or no sense without that evidence. *Id*.

In this case, the trial court reasonably could have found that evidence concerning the CPS proceedings was admissible as contextual evidence because it was necessary to the jury's understanding of the offense and appellant's state of mind. *See, e.g., Worthy v. State,* 312 S.W.3d 34, 40-41 & nn.26-28 (Tex. Crim. App. 2010). This evidence also helped establish appellant's motive or intent and the underlying offense of retaliation. The trial court's decision to admit this evidence fell within the zone of reasonable disagreement.

### 3. Evidence that Appellant Kicked Luke

In addition, appellant complains about the admission of evidence that she kicked Luke. The record shows that after the prosecutor asked appellant about her conduct toward Zach, he asked, "And how about Luke?" Appellant responded, "I've never harmed a hair on Luke's head." The prosecutor began the next question, "[D]id you ever kick—," and defense counsel objected that there had been no proffer about kicking anyone. The trial court initially sustained the objection.

The prosecutor explained that the question concerned appellant's bad acts toward Luke as described in the CPS records and that appellant's broad statement that she had never harmed Luke opened the door to cross-examination with specific instances of conduct. The trial court found that this evidence was admissible under Rules 401, 403, and 404(b) and that it was relevant for purposes of cross-examining appellant about her statement that she had never hurt Luke. The prosecutor then asked appellant if she had ever kicked Luke, and she denied it. She stated that she knew Zach had accused her of that, but in fact it was Zach who had kicked Luke when Luke walked between Zach and his video game.

When a witness makes a broad statement of good conduct or character, the opposing party may cross-examine the witness with specific instances rebutting that statement. *Daggett,* 187

S.W.3d at 454 n.24; *see also Wheeler v. State,* 67 S.W.3d 879, 886 & n.15 (Tex. Crim. App. 2002). The trial court did not err in finding that appellant's blanket statement that she had never harmed a hair on Luke's head opened the door to specific instances of her abusing Luke. Point of error five is overruled.

### IV. Jury Argument

In point of error six, appellant asserts that the trial court erred in overruling her objection to the prosecutor's improper and inflammatory closing argument at the guilt phase. Appellant asserts that the prosecutor called her a liar, complained about how long the prosecutor had worked on the case, expressed personal hatred toward appellant, bolstered her argument by saying good things about herself, and called defense counsel liars.

At trial, appellant objected to two of many instances in which the prosecutor accused appellant of lying or called her a liar. Appellant also objected to the prosecutor's sole comment accusing defense counsel of saying things that were untrue. Appellant did not object to the other parts of the prosecutor's argument specified above. Therefore, appellant failed to preserve error with respect to all of the alleged errors now described, except for the prosecutor's comments about appellant lying, to which defense counsel objected, and the comment accusing defense counsel of saying things that were untrue. *See* Tex. R. App. P. 33.1; *Threadgill v. State,* 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

The record shows that before defense counsel objected, the prosecutor argued that the defense's theory that Walker had a seizure was not based on the medical evidence but instead was based only on appellant's false testimony:

> [State:] They told you that . . . oh, she might have died of a seizure, a seizure, a seizure, a seizure. Who have we heard that from? That liar over

there.

And let me make something real clear. I never said she was smart. I think she's stupid and a lot of other things. How dare she lie about that woman?

And if it doesn't make you mad, it ought to. It ought to infuriate you. It's pitiful. It's pathetic that she can come in here in this court of law, after I've worked for two years with that Sheriff's Office out there, and throw it out there, and her lawyer go, well, would you jump out of a plane? Who cares about a plane?

[The lead prosecutor is] right about one thing. I care about Cherry Walker. I sure do. And I despise the woman that killed her, more than I can ever explain to you, ever. Because you know why she killed her? She's retarded. That's why she did it.

I told y'all in voir dire, the ones I questioned, that anybody that knew me knew one thing, that I would always, till (sic) the day I die, stand up for a kid. I'd give my life for a child. And there's one right there (indicating).

How lawyers can stand in this courtroom and say things that aren't true are (sic) beyond me.

[Defense:]      Objection, Your Honor.[5]

The Court:      It's overruled, [counsel]. It's argument.

The prosecutor then asked the jurors if they believed that Walker died of sudden unexpected death in epilepsy syndrome or a seizure, and she answered the question in the negative.

Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Freeman v. State,* 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). The

---

[5]      Arguably, appellant's general objection preserved error with respect to this comment. *See State v. Rosseau,* 396 S.W.3d 550, 555 (Tex. Crim. App. 2013) (reviewing court should examine the record to determine whether the trial court understood the basis of a party's request).

prosecutor properly may comment on the merits of the defense's argument and the defendant's credibility as a witness. *See, e.g., Garcia v. State,* 126 S.W.3d 921, 925 (Tex. Crim. App. 2004); *Satterwhite v. State,* 858 S.W.2d 412, 425 (Tex. Crim. App. 1993).

When appellant testified, she conceded that she had lied to her friends and law-enforcement officials about her activities on the evening Walker died. Therefore, the trial court did not err in overruling defense counsel's objections to the prosecutor's comments suggesting that appellant was not credible. *See Satterwhite,* 858 S.W.2d at 425. Even assuming error, the prosecutor's comments were not harmful in light of numerous other unobjected-to comments by both the prosecutor and defense counsel that appellant had lied. *See Davis v. State,* 329 S.W.3d 798, 823 (Tex. Crim. App. 2010) (indicating that error was cured when essentially same argument was repeated without objection).

However, to the extent that the prosecutor's comment could be interpreted as challenging defense counsel's integrity, it was arguably improper. A prosecutor's argument runs a risk of improperly striking at a defendant over the shoulder of counsel when it is made in terms of defense counsel personally and when it explicitly impugns defense counsel's character. *Brown v. State,* 270 S.W.3d 564, 572 (Tex. Crim. App. 2008).

In the past, we have found that comments similar to the prosecutor's remark in this case were improper. *See, e.g., Dinkins v. State,* 894 S.W.2d 330, 357 (Tex. Crim. App. 1995) (finding that prosecutor's statement that defense counsel "wants to mislead you a little bit" was improper because it cast aspersion on defense counsel's veracity with the jury); *see also Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (assuming that prosecutor's argument that the defense attorneys were using argument to divert the jury's attention from the truth or obscure the issues was improper).

More recently, however, we concluded that a prosecutor's statement that defense counsel was "going to put himself before twelve citizens of this community" and "argue that hogwash that you've heard" was merely a colorful way of stating the prosecutor's opinion of the merits of defense counsel's argument. *See Garcia,* 126 S.W.3d at 925.

In this case, given the emotional tone of the prosecutor's comments that immediately preceded the comment about defense counsel, this comment resembles the improper comments in *Mosley* and *Dinkins*. *See Cannady v. State,* 11 S.W.3d 205, 212 (Tex. Crim. App. 2000) (stating that prosecutor's comments attacking defense counsel are improper because they unfairly inflame the minds of the jury against the accused). Arguably, the prosecutor portrayed defense counsel as being dishonest for presenting the defense's theory in court.

Even assuming error, however, we conclude that the prosecutor's comment does not warrant a reversal. Improper comments on defense counsel's honesty are non-constitutional errors within the purview of Texas Rule of Appellate Procedure 44.2(b). *See Mosley,* 983 S.W.2d at 259. A non-constitutional error that does not affect a defendant's substantial rights must be disregarded. *Brown,* 270 S.W.3d at 572. To determine whether an appellant's substantial rights were affected, we balance the severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct. *Martinez,* 17 S.W.3d at 692-93.

Defense counsel's argument that preceded the prosecutor's comment had encouraged the jury to believe appellant's testimony concerning the circumstances of Walker's death and to focus on the medical experts' inability to testify with absolute certainty that Walker did not die of a seizure. The defense's theory depended on the jury's acceptance of appellant's testimony as true. However, as discussed in points of error one and five, there was ample evidence from which the jury reasonably

could infer that appellant's self-serving account of Walker's death was not credible and that Walker did not die of a seizure.

The prosecutor's brief remark about defense counsel, although arguably improper, did not constitute severe misconduct. The court took no curative measures, but the prosecutor made no further references to defense counsel. Given the weight of the inculpating evidence, the certainty of conviction absent the misconduct, if any, remains unchanged. *See Brown,* 270 S.W.3d at 573. Therefore, appellant's substantial rights were not affected. Point of error six is overruled.

## V. Punishment Phase

Appellant asserts that, through the testimony of Warden Black, the State presented false and misleading evidence and was obligated to correct that misleading evidence but failed to do so. She further asserts that her attorney rendered ineffective assistance by failing to correct the misleading testimony by seeking to have admitted into evidence the prison's classification policy.

### A. Warden Black's Testimony

In point of error seven, appellant asserts that the State knowingly presented false and misleading evidence in the punishment phase and failed to repudiate it, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Appellant complains that Senior Warden Octavious Black falsely testified that if appellant received a life sentence, she would be classified at a G2 custody level. She argues that Black's testimony is contrary to the holding in *Estrada v. State,* 313 S.W.3d 274 (Tex. Crim. App. 2010), and to the testimony of State's witness Stephen Rogers, who testified correctly that such an inmate would be classified at a G3 custody level and could never improve that status. Appellant asserts that the State had an obligation to correct Black's false testimony rather than simply presenting contradictory testimony and leaving the jury to decide which

expert was correct. Because the State did not do so, appellant contends that she should receive a new punishment hearing.

The record shows that Black testified that she worked for the Texas Department of Criminal Justice (TDCJ) for twenty-seven years. She started as a correctional officer and then became a case manager and chief case manager before being promoted to assistant warden and then senior warden. For about seven years, she was the senior warden of the women's prison where the women's death row is located. Most recently, she was the warden of a women's state-jail unit. She testified that the prison conditions for female inmates are very different from the conditions for male inmates.

Black testified that life-without-parole offenders start out at a G2 custody level "like everyone else." She explained that G1 is the least restrictive custody level, while G5 is the most restrictive custody level. The following exchange ensued:

> [State:] So even if you're convicted of capital murder where you receive life without parole, you're still going to be only one down from the least restrictive [classification] in TDC?
>
> [Black:] Yes, sir.
>
> [State:] Why—and just so you can explain it, here is someone being convicted of the most serious crime you can commit. Why would they go in almost at the least restrictive level?
>
> [Black:] They're going to start that person off at the beginning, like everyone else, on a level playing field—
>
> [State:] Okay.
>
> [Black:] —until they receive disciplinary infractions or they become violent in the facility.

Black went on to testify that capital life-without-parole inmates can do everything that other general population inmates can do. Female inmates in general population live in a 53-person

dormitory rather than in cells.  G2 inmates can have contact visits.  Even if a capital-life inmate were moved down to G5, or "close custody," she could work her way back up to G2 with good behavior.

On cross-examination, Black stated that the classification system is the same for men and women.  Black acknowledged that she did not know of a recent policy change whereby a man sentenced to life without parole would enter the prison system at the G3 custody level.  Black stated that she had not worked in a men's prison for ten years, but she recalled that approximately two years ago, female capital-life inmates were coming in at a G2 custody level.

The State later called Stephen Rogers, who testified that he had recently retired after working for TDCJ for over twenty-nine years.  During that time, he had worked as a correctional officer, warden, Classification Case Manager, Assistant Chief of Classification, Chief of Classification, and Program Administrator for Classification, and then he was a State Classification Committee member for thirteen years before he retired.[6]  The prosecutor asked Rogers whether he was very familiar with how people go into the penitentiary and how the offense of conviction would affect an offender's custody status, and Rogers agreed that he was.  The prosecutor continued:

[State:]     We had Ms. Black in here.  She does a good job down there, doesn't she?

[Rogers:]   I think she does.

[State:]     And she was thinking that the—and, of course, she's a warden and not part of the classifications, I guess.

[Rogers:]   Wardens a lot of time will chair a classification committee on the unit level.

[State:]     On the unit level?

---

[6]     We adopt the capitalization of these job titles as reflected in the reporter's record.

[Rogers:]        Yes, sir.

[State:]        Let me ask you this. A woman convicted of capital murder who receives life without parole goes into the penitentiary as a what?

[Rogers:]        Life without parole by definition of our policy is G3 custody.

[State:]        Right. And G3 custody is—what can they do with G3 custody?

Rogers answered that an offender in G3 custody could do pretty much everything other general population offenders could do. He described the job and housing restrictions that applied to G3 inmates, including being unable to work in an area with free and frequent access to the unit and not being assigned to work near a fence. A G3 offender would live in a prison dormitory with 50 to 60 other general population inmates, but she would not be allowed to live in the dormitory building between the main building and the outer fence. A capital-life inmate could have contact visits and move around the penitentiary like other general population inmates. G3 status would not prevent such an inmate from working in the kitchen with knives and forks, although it was unlikely that a warden would place her in that position. Rogers explained that a capital-life inmate could not improve her custody level to G2, but she could receive a more restrictive classification if she had disciplinary problems.

Unlike the defense team in *Estrada,* defense counsel in this case was on notice, through our published opinion in *Estrada,* of the TDCJ policy providing that a capital-life offender would not receive a custody classification less restrictive than G3. *Cf. Estrada,* 313 S.W.3d at 287. Further, the record indicates that defense counsel was actually aware of this policy because he questioned Black about it. However, we surmise from his questioning that defense counsel was not sure whether the policy applied equally to female as well as to male offenders. Black's responses indicated that she was not aware of the policy and suggested that her information might be out of

date.

Both Black and Rogers were the State's witnesses, and the State, through its questioning, endorsed Rogers as the classification expert who would best know the custody level applicable to a capital-life inmate. Unlike Black, who stated that TDCJ policies applied equally to male and female offenders but also acknowledged that she did not know that men sentenced to capital-life terms came in at G3 custody, Rogers clarified that the policy at issue assigned all inmates who are sentenced to capital-life terms to a G3 custody level. On this record, there is not a fair probability that appellant's death sentence was based upon Black's incorrect testimony. *See and compare Estrada,* 313 S.W.3d at 287-88. Point of error seven is overruled.

**B. Ineffective Assistance For Failure to Introduce Prison Classification Policy**

In point of error eight, appellant asserts that she received ineffective assistance of counsel when trial counsel failed to correct the record by introducing the current TDCJ classification policy in response to the State's experts' inconsistent testimony described in point of error seven, above. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). She contends that counsel should have introduced the written policy to show that Black's testimony was false and to resolve the conflicting testimony to appellant's benefit.

"Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State,* 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). In this case, the record does not overcome this presumption. As discussed in point of error seven, the TDCJ policy was not in dispute; Black acknowledged that she was not aware of it. Rather, the question was whether the policy applied equally to female and male inmates. Further, Rogers's testimony clarified this matter. Point of error

eight is overruled.

## C. Exclusion of Mitigation Evidence

In point of error nine, appellant asserts that the trial court abused its discretion by excluding her expert's testimony regarding mitigation, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, appellant complains that the trial court did not allow her neuropharmacological expert, Dr. Jonathan Joseph Lipman, to testify about the effects of physical illnesses, such as lupus, on the brain. She contends that the trial court erroneously disregarded evidence that Lipman was well qualified to testify about the issue and instead disqualified him solely because he was not a medical doctor. She argues that the trial court's ruling deprived her of the ability to present evidence that "went to the core of her case in mitigation" because Lipman's testimony would have given the jury a better understanding of appellant's condition and would have countered the prosecutor's argument that the jurors had heard nothing that lessened appellant's blameworthiness.

We review the trial judge's ruling on the admissibility of scientific expert testimony under an abuse of discretion standard. *Rodgers v. State*, 205 S.W.3d 525, 533 (Tex. Crim. App. 2006). We will not substitute our judgment for that of the trial court, but rather will determine whether the trial court has made a decision that is outside the zone of reasonable disagreement. *Tillman v. State,* 354 S.W.3d 425, 442 (Tex. Crim. App. 2011). We review the ruling in light of what was before the trial court at the time the ruling was made. *Rodgers,* 205 S.W.3d at 528-29.

In determining the admissibility of expert testimony, the Texas Rules of Evidence require that a trial judge make three separate inquiries, whether: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is

an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers*, 205 S.W.3d at 527. These conditions are commonly referred to as qualification, reliability, and relevance. *Vela v. State,* 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

With respect to qualification, the proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Id.* at 132. Because the spectrum of education, skill, and training is wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications to assist the jury as an expert on a specific topic in a particular case. *Davis,* 329 S.W.3d at 813.

Before appellant proffered Dr. Lipman's testimony, the jury learned through the testimony of appellant's forensic psychologist, Dr. Antoinette McGarrahan, that appellant had a borderline personality disorder. McGarrahan also testified that in the months leading up to the offense, appellant had been prescribed Prednisone (a steroid), Celexa (an antidepressant), and Klonopin (an anti-anxiety medication). McGarrahan was not aware of any medication that would cause borderline personality disorder, but some medications could exacerbate a pre-existing psychiatric condition. She testified that Prednisone can affect a person's psychological profile. In June, appellant reported that she had stopped taking Celexa and Klonopin. McGarrahan noted that if a person suddenly stops taking Klonopin, she may experience a rebound effect of anxiety and agitation. In addition, appellant had been diagnosed with lupus. McGarrahan testified that lupus presents its own psychiatric, psychological, and cognitive problems and can exacerbate a psychiatric condition.

Appellant then proffered Dr. Lipman's testimony. At the Rule 702 and Rule 705 hearing,

Lipman testified that he had a Ph.D in neuropharmacology and that his particular expertise was the effects of drugs on nerves, brain, and behavior, with a specialized research interest in pain and addiction. He had been on the faculty of several medical schools, where he taught pharmacology to medical students and residents, but he was not a physician or psychologist. He also worked with clinical psychiatrists and psychologists who requested his consultation on particularly complex drug issues. In that context, he sometimes helped physicians and neuropsychologists to differentiate the effects of medications on the brain from brain damage.

Lipman did not purport to make a diagnosis in this case. He did not interview appellant, but he reviewed news reports of the pretrial proceedings, appellant's counseling records, ETMC medical records, a rheumatology report from 2000, and some pharmacy records. Lipman anticipated that his testimony would educate the jury about the known side effects of Prednisone, Celexa, and Klonopin, which had been prescribed to appellant in the months before the offense, as well as the adverse effects associated with discontinuing Celexa and Klonopin. He expected to testify that Prednisone commonly has adverse effects in people who have an underlying psychiatric disorder. He acknowledged that he could not confirm that appellant had taken the medications as prescribed. Further, he did not know how much of appellant's history of psychological problems was due to the medications as opposed to a personality disorder.

Lipman stated that he had testified in many court cases and that he testified only in the area of neuropharmacology. During cross-examination, the prosecutor asked:

> And so just if I understand, what you're saying is you can testify that these medications can have an effect on someone with an autoimmune disease who has a personality disorder. They can or they may not, but you cannot say to what degree, if any, it had an effect on [appellant], because you can't even—you can't say she took the medication for starters, and you didn't see her early enough.

Lipman responded, "All those three things are true." He reiterated that in this case, his testimony would educate the jury about the known adverse effects of the medications that appellant had been prescribed and the particular vulnerability of a person with a borderline personality disorder to those effects. The court ruled that this testimony was admissible.

During Dr. Lipman's testimony before the jury, the State objected to defense counsel asking Lipman whether physical illnesses can cause psychological problems, stating that Lipman was not a medical doctor and therefore he was not qualified to testify about how a physical illness could impair cognitive ability. Defense counsel countered that Lipman dealt with situations "all the time" where the question was whether an effect on the brain was caused by drugs or by a physical illness such as lupus. The trial court sustained the objection, ruling that Lipman could not testify about the effect of lupus on the brain because he was not qualified to testify outside his area of expertise, which was neuropharmacology.[7]

On this record, we hold that the trial court did not abuse its discretion when it determined that the effect of a physical illness on the brain was outside Lipman's area of expertise. Lipman had testified that his area of expertise in neuropharmacology was focused on the effects of drugs on nerves, brain, and behavior. Lipman's testimony that he sometimes helped neuropsychologists and physicians with complex cases did not necessarily establish that he was qualified to give an opinion concerning the psychological effects of physical illness. Point of error nine is overruled.

## VI. Challenges to Article 37.071

---

[7]     Later, defense counsel made a bill of exception during which Lipman elaborated on his qualifications to address the question of whether and how a physical illness such as lupus might affect a person's brain and behavior. However, this additional information was not before the trial court at the time of the ruling. Therefore, we do not factor it into our review. *See Rodgers v. State,* 205 S.W.3d 525, 528-29 (Tex. Crim. App. 2006).

In point of error ten, appellant asserts that the trial court erred by including the statutory definition of mitigation in the jury charge, over appellant's objection, in violation of the Eighth and Fourteenth Amendments. Article 37.071, section 2(f)(4), provides, in relevant part, that the trial court shall charge the jury that, in answering the mitigation special issue, the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness. Appellant argues that this definition is facially unconstitutional and that the State's use of it in final argument (e.g., "There is nothing that lessens that killer's moral blameworthiness") was also unconstitutional.

Appellant acknowledges that this Court has repeatedly rejected this claim but urges us to revisit the matter based on the United States Supreme Court's decision in *Tennard v. Dretke*.[8] We, however, are not persuaded. *Cf. Penry v. Johnson,* 532 U.S. 782, 803 (2001) (stating that jury must be clearly directed to consider a defendant's mitigating evidence as it bears on his personal culpability). We decline to revisit the matter. *See Coble,* 330 S.W.3d at 296. Point of error ten is overruled.

Appellant also acknowledges that this Court has previously rejected the issues raised in points of error eleven through eighteen. She avers that she has submitted them on direct appeal in order to preserve them for future post-conviction proceedings. In point of error eleven, appellant asserts that Article 37.071 violates the Eighth Amendment's prohibition against cruel and unusual punishment because it allows the jury too much discretion and lacks the minimal standards and guidance needed to avoid the arbitrary and capricious imposition of the death penalty. In point of

---

[8]     542 U.S. 274, 283-84 (2004) (disapproving the appellate practice of screening evidence for its "constitutional relevance" before reaching the question of whether jury instructions enabled the jury to consider and give mitigating effect to that evidence).

error twelve, appellant asserts that Article 37.071 violates the Fourteenth Amendment's due process requirement because it implicitly places the burden of proving the mitigation special issue on a defendant. In point of error thirteen, appellant asserts that the trial court erred in denying her motion to hold Article 37.071, sections 2(e) and 2(f), concerning the burden of proof at punishment, unconstitutional under Article I, sections 10 and 13 of the Texas Constitution. In point of error fourteen, appellant asserts that the Texas death penalty scheme violates due process because the mitigation special issue fails to require the State to prove an absence of sufficient mitigation circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*[9] and its progeny.

In point of error fifteen, appellant asserts that the Texas death penalty scheme violated her constitutional rights to be protected from cruel and unusual punishment, to an impartial jury, and to due process of law because of vague, undefined terms in the punishment-phase jury instructions. In points of error sixteen and seventeen, appellant asserts that the Texas death penalty scheme infringed upon her federal and state constitutional rights because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty and allow the jury unlimited discretion to consider all evidence that might militate against the imposition of death. In point of error eighteen, appellant asserts that the statutory "*Penry*" special issue is unconstitutional under the Eighth and Fourteenth Amendments because it "permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*."[10]

As appellant acknowledges, we have previously rejected these claims. *See Saldano v. State,* 232 S.W.3d 77, 104-09 (Tex. Crim. App. 2007). We decline to reconsider them. Points of error

---

[9]     530 U.S. 466 (2000).

[10]     408 U.S. 238 (1972).

eleven through eighteen are overruled.

We affirm the judgment of the trial court.

Delivered: November 19, 2014
Do Not Publish